UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

LEON ST. CLAIR NATION,

                                                   Plaintiff,

                - against -

THE CITY OF NEW YORK, THE NEW YORK CITY
DEPARTMENT OF BUILDINGS, and PATRICIA J.
LANCASTER,

                                         Defendants.

**DECLARATION OF STEPHEN P. KRAMER**

08 CV 00862 (GEL)

------------------------------------------------------------------x

       **STEPHEN P. KRAMER** declares, under penalty of perjury and pursuant to 28 USC § 1746, that the following is true and correct:

       1.    I am Senior Counsel to the Commissioner of the New York City Department of Buildings (the "Department" or "DOB"). I joined the Department as Chief of Staff in 2003 and became the Commissioner's senior public policy and legal advisor in 2007.

       2.    I am familiar with the facts and circumstances of the instant action based upon my personal knowledge regarding the enactment of the statutory amendment the application of which plaintiff challenges in this lawsuit, upon records and files maintained by the City, and upon communications with various City employees.

       3.    I make this declaration in opposition to plaintiff's motion for a preliminary injunction staying the City from putting into effect a decision prohibiting plaintiff from filing plans or applications with the Department for the next two years.[1]

---

[1] The exhibits referenced in this declaration are submitted pursuant to the accompanying Moed Declaration in opposition to plaintiff's motion for a preliminary injunction (the "Moed Dec.").

## REGULATORY FRAMEWORK

### A.  Professional Certification

4.  In New York City, all construction work other than minor repairs must be performed pursuant to permits issued by the Department of Buildings based on the filing of applications accompanied by plans or other appropriate documentation. Depending on the nature of the work for which permission is sought, applications might be filed by, for example, a Registered Architect, a Professional Engineer, a licensed electrician, or a licensed plumber. The Department of Buildings relies on the professionals who file applications to use their skill, expertise, and integrity in either creating the documentation or collecting it from other reliable professional sources, and to file accurate and truthful applications supported by accurate and truthful documentation. The Department is not staffed at a level that would provide for an in-depth examination of each submission to the Department to independently establish the accuracy of the submissions or to directly supervise the professionals who are filing applications. On the contrary, the professionals who file applications are expected to be acting in accordance with the professional standards and ethical obligations applicable to their specialties.

5.  Pursuant to New York City Administrative Code ("Admin. Code") § 27-143, the Department of Buildings has established procedures for architects and engineers to provide them the privilege of filing applications subject to "limited supervisory check" and "professional certification." These applications are subject to even more limited review by DOB staff and are "accepted" by DOB or "approved" by DOB, in reliance on the attestation by the filing professional that the proposed work as set forth in the application is in accord with all laws and rules applicable to the proposed construction. Provisions setting forth the obligations of those who seek limited supervisory check or who select to professionally certify their filings are

set forth in Title 1 of the Rules of the City of New York ("RCNY"). Among the terms set forth in 1 RCNY § 21-01 as a condition of filing under limited supervisory review is that the filer explicitly acknowledge that DOB "will rely upon the truth and accuracy of the statements contained in the construction application made by them, and any amendments submitted in connection therewith, as to compliance with the provisions of the Zoning Resolution, the Building Code and other applicable laws and regulations." 1 RCNY § 21-01(b)(4).

6.  Set forth in 1 RCNY § 21-02 are the provisions governing exclusion from the privilege of limited supervisory check or professional certification. The grounds for exclusion include submitting filings that reflect negligent or incompetent understanding of the applicable laws, 1 RCNY § 21-02(a)(1), submitting filings that "were required to be prepared by the architect or engineer or under his or her supervision but that were not prepared by the architect or engineer or under his or her supervision," 1 RCNY § 21-02(a)(2), or "knowingly or negligently ma[king] false or misleading statements on … any certificate, form, signed statement, application or report filed with the City," 1 RCNY § 21-02(a)(3), or "engag[ing] in any conduct related to any activity performed in connection with his or her profession that evidences a failure to comply with the provisions of Federal, State or local law, rules or regulations or a Department order or requirement," 1 RCNY § 21-02(a)(7).

7.  The procedures for bringing administrative charges against someone who the Department has reasonable basis to believe has submitted a false filing, and the consequences of being found guilty of false filing after a hearing at the Office of Administrative Trials and Hearings ("OATH"), including exclusion from the limited supervisory check and/or professional certification program, are set forth in 1 RCNY § 21-02(b).

8. Approximately 20% of professionally certified applications are randomly audited to determine their compliance with the Building Code and other applicable laws. In addition, other applications are audited based on complaints from community boards, elected officials, and members of the public.

**B.    Admin. Code § 26-124(c) as Amended as of August 15, 2007**

9. Plaintiff challenges the application to him of a newly enacted Administrative Code provision providing enhanced remedial measures for licensed engineers and architects who file false statements with the Department.

10. Prior to the enactment of the recent amendment, when a building professional was found to have submitted false documentation or made false statements to the Department, the Department could suspend or permanently revoke the professional's right to professionally certify future submissions. Additionally, pursuant to Admin. Code § 27-197, the Department could revoke the building permit that was issued based on the improper plans.

11. However, the remedy of refusal to accept professionally certified plans was insufficient to deal with egregious instances of false filings. For example, a Department of Buildings review of plans would not reveal an instance where the actual circumstances in the field did not comport with the plans as submitted. Thus, a full Departmental review of the type of plans at issue in this case – two builder's pavement plans and an alteration application for a residence – would not reveal that the conditions attested to by the applicant had no relationship to the actual field conditions.

12. Community boards, elected officials, and numerous members of the public have voiced repeated complaints over the last few years with the adequacy of applications

submitted by professionals. Indeed, the Administrative Code was amended by Local Law 4 of 2007 to provide:

> The commissioner shall suspend, revoke or otherwise condition the professional certification privileges of each professional engineer or registered architect who has been found, after a hearing at the office of administrative trials and hearings pursuant to the department's rules, to have 1) knowingly or negligently professionally certified an application and/or plans that contained false information or were not in compliance with all applicable provisions of law or 2) submitted two professionally certified applications within any twelve-month period that either led to revocation of a permit or otherwise demonstrated incompetence or a lack of knowledge of applicable laws.

Admin. Code § 27-143.2(b).

13. On April 19, 2007, the New York State legislature adopted Chapter 542 of 2007, which provided additional remedial measures with respect to the filing of false statements to the Department. The measure, which became effective on August 15, 2007, and which is codified as Admin. Code § 26-124(c), reads as follows:

> In addition to any other penalty provided by law, the commissioner may refuse to accept any application or other document submitted pursuant to or in satisfaction of any requirement of this chapter or of chapter one of title twenty-seven of this code or any rule or regulation of any agency promulgated thereunder that bears the signature of any person who has been found, after a hearing at the office of administrative trials and hearings pursuant to the department's rules, to have knowingly or negligently made a false statement or to have knowingly or negligently falsified or allowed to be falsified any certificate, form, signed statement, application, report or certification of the correction of a violation required under the provisions of this chapter or of chapter one of title twenty-seven of this code or any rule or regulation of any agency promulgated thereunder.

14. This statute, enacted by the State legislature and signed into law by the Governor, applies not only to false filings by professional architects and engineers, but to any

Kramer Declaration                - 5 -

false filings—whether by a Departmental licensee (such as a plumber or electrician) or any other person authorized to submit filings to the Department.

## THE CHARGES BROUGHT AGAINST PLAINTIFF

15.     In 2005, a DOB Plan Examiner in the Brooklyn Borough Office, John Gallagher, determined that photographs that had been submitted to him for review with respect to three different construction projects appeared to be doctored or falsified. The photographs for all three projects had been submitted under plaintiff's seal. Expediter Hershey Fekete was the expediter who had filed the photographs in two of the three cases. Mr. Gallagher brought this to the attention of DOB's investigations unit, where it was determined that charges should be brought against both Mr. Fekete and plaintiff.

16.     By Petition dated December 19, 2006, the Department initiated an administrative proceeding against plaintiff and Fekete for having filed false documents with the Department. The Petition was twice amended and the final charge upon which plaintiff was adjudicated was as follows:

| | |
|---|---|
| **CHARGE #1:** | **RCNY §21-02(b)(3):  The architect or engineer has knowingly or negligently made false or misleading statements or knowingly or negligently falsified or allowed to be falsified any certificate, form, signed statement, application or report filed with the Department, or knowingly failed to file a report required by law or the Department or willfully impeded or obstructed such filing, or induced another person to do so.** |
| Specification #1: | On or about December 16, 2004, Respondent or his agent submitted doctored photographs to the Department of Buildings ("Buildings") in connection with a Builder's Pavement Plan for 11 Lynch Street, Brooklyn, New York. |

**Specification #2:** On or about February 15, 2005, Respondent or his agent submitted doctored photographs to Buildings in connection with a Builder's Pavement Plan for 91-99 South 3rd Street, Brooklyn, New York.

**Specification #3:** On or about June 21, 2006, Respondent or his agent submitted a "Plan/Work Report For PC Filing" to Buildings that falsely represented an existing two story building at 150 29th Street, Brooklyn, New York when, in fact, there was not an existing two story building at that location.

**Specification #4:** On or about July 20, 2006, Respondent or his agent submitted "Site Plan, Floor Plans and Notes" to Buildings that falsely represented an existing two story building at 150 29th Street, Brooklyn, New York when, in fact, there was not an existing two story building at that location.

**Specification #5:** On or about December 21, 2006, Respondent or his agent submitted a "Post Approval Amendment" to Buildings that falsely represented fire damage to an existing two story building at 150 29th Street, Brooklyn, New York when, in fact, there was not an existing two story building at that location.

17. Plaintiff was represented by attorney Stuart Klein, whose firm represents plaintiff in the instant lawsuit. The related case against expediter Fekete was heard in the same consolidated proceeding.

18. Plaintiff's attorney brought pre-trial motions to dismiss the charge on various grounds. All of those motions were denied.

19. Evidence was presented at hearings held on May 21, 22, and 29, 2007 before Administrative Law Judge ("ALJ") Kara Miller at OATH. The transcripts are annexed to the Moed Dec. as Exhibit A.

20. After the completion of the hearings, attorneys for both plaintiff and the Department submitted their summations to the ALJ in the form of post-trial memoranda.

21. On October 26, 2007, ALJ Miller issued a Report and Recommendation to the Department of Buildings (annexed to the Moed Dec. as Exhibit B). She sustained the charge that plaintiff had submitted falsified photographs and false plans to DOB. She found that the charge had not been substantiated as to plaintiff having knowingly filed the false documents but that negligence in those false filings had been established:

22. With respect to 11 Lynch Street (Specification #1), ALJ Miller reviewed the facts as follows: Plan Examiner Gallagher examined photographs that had been submitted as part of a Builder's Pavement Plan ("BPP") (annexed to the Moed Dec. as Exhibit C). He observed that the garbage cans appeared to be "floating" on the sidewalk, that they lacked the shadows that would have been expected, given the other shadows in the photographs, that there were chains leading from the garbage cans that were not connected to the wall behind them, and that the image of brick wall itself showed clear tampering. Ex. B at 4. Mr. Gallagher subsequently went to the site and observed that the photographs that had been submitted did not accurately reflect the existence of a flight of seven stairs up to the front door and the presence of a trench along the front wall for the garbage cans. Ex. B at 4. A DOB Investigative Inspector took photographs of the actual conditions and those were introduced into evidence (annexed to the Moed Dec. as Exhibit D). ALJ Miller made the following findings:

> With respect to respondent Nation, the Department argued that he must conduct himself in accordance with a professional standard of care that requires him to ensure the accuracy of the documents that he certifies. The Department relies on the accuracy of information submitted by a licensed professional and the public has a right to expect that such information will be accurate. ... Although [DOB witness Plan Examiner John] Gallagher

acknowledged that there is nothing in the Building Code or Department policy notices that requires an expediter or an engineer to visit a particular site or actually take submitted photographs, he explained that licensed engineers are bound by a professional code [transcript citations omitted].

Section 29.3(a)(3) of the Rules of the New York State Board of Regents, provides that unprofessional conduct for an engineer includes, "certifying by affixing the licensee's signature and seal to documents for which the professional services have not been performed by, or thoroughly reviewed by, the licensee." 8 NYCRR § 29.3 (Lexis 2007). The Department argued that it has an expectation that a licensed engineer participating in the self-certification program will abide by the provisions set forth in this professional code.

In addition to the professional standards set forth in the Rules of the Board of Regents, the National Society of Professional Engineers has published a Code of Ethics for Engineers which states in general, that "the services provided by engineers require honesty, impartiality, fairness and equity, and must be dedicated to the protection of the public health, safety and welfare." [citation to exhibit omitted.] This ethics code, sets forth as a rule of practice that "engineers shall not affix their signatures to any plans or documents dealing with subject matter in which they lack competence, nor to any plan or document not prepared under their direction and control." [citation to exhibit omitted]

Prior to making submissions under the Department's self-certification program, a professional's certification form provided by the Department must be executed by a licensed architect or engineer. The certification form, which is signed and sealed by the engineer, reads,

> I hereby state that I have exercised a professional standard of care in certifying that the filed application is complete and in accordance with applicable laws, including the rules of the Department of Buildings, as of this date. I am aware the Commissioner will rely upon the truth and accuracy of this statement. . . . I further realize that any misrepresentation or falsification of the facts made knowingly or negligently by me, my agents or employees, by others with my knowledge, will render me liable for legal and disciplinary action by the Department of Buildings and other

> appropriate authorities, including termination of participation in the professional certification procedures at the Department of Buildings. [citation to exhibit omitted]

> ... Respondent Nation accepted and acknowledged that he would be bound by a professional standard of care when he signed and sealed the certification form. ... [R]espondent Nation's profession is guided by a code of conduct set forth by the New York State Board of Regents, the licensing authority for engineers. This code of conduct provides a standard to which he should be held by the Department. It requires a licensed engineer to do a thorough review of any document that the professional puts his signature and seal on, especially when he did not provide the underlying engineering services. Moreover, he has an ethical obligation not to affix his signature on any plans or documents that were not prepared under his direction and control.

> \* \* \*

> Regardless of whether respondent Nation had actual knowledge that the photographs were fraudulent, he should have known that they were not genuine. Mr. Gallagher determined that the photographs were altered almost immediately. He testified that the alterations were readily apparent to the trained eye and that a licensed engineer should have been able to easily determine that they had been doctored. I found Mr. Gallagher to be a professional and responsible witness, whose testimony was credible and unbiased. Moreover, his assessments demonstrated keen insight and judgment. In contrast, respondent Nation was evasive and vague. He had a cavalier attitude and unabashedly acknowledged that he only took a minute or two to review the photographs.

> As a licensed engineer, prior to certifying a document for services that he did not perform, respondent Nation is professionally and ethically required to thoroughly review it. Since neither he nor his agents/employees actually performed engineering services in connection with the pavement at 11 Lynch Street, respondent Nation was obligated to thoroughly review the BBP before attesting to its accuracy. A thorough review would have required him to take more than two minutes to evaluate the photographs.

> If he had done a professional review by taking the time necessary to examine the photographs, surely as a licensed engineer with nearly twenty years of experience, he would have

    detected that the photographs were suspicious. He would have observed that the garbage cans appeared to have been added into the photographs and were suspended or floating above the sidewalk, the bricks in the facade did not match and appeared to be floating, and the garbage cans had chains suspended in mid-air without being attached to anything. Even if he was unable to determine exactly what was wrong with the photographs, he should have been alerted to the fact that he or one of his agents/employees needed to go to the site to verify their accuracy. It is difficult to believe that a licensed professional attesting to the accuracy of a photograph would be willing to certify it when he has never been to the site, does not know who took the picture, and spent less then two minutes reviewing the photograph.

    Respondent Nation failed to exercise the degree of care that a licensed professional of ordinary prudence would have exercised under the same circumstance. Simply stated, he acted negligently. Respondent Nation should have known that there was something wrong with the photographs. It is clear that he failed to even conduct a minimal evaluation which would have led him to conclude that the photographs had been altered. In addition, since respondent Nation did not perform or supervise the underlying work in the photographs, either he or his agent/employee should have gone to the site to ensure that the work was properly done prior to certifying the photographs. Thus, he failed to exercise a professional standard of care [citation to another OATH Report and Recommendation omitted].

    Accordingly, I find that respondent Nation negligently made false statements and false submissions by certifying the fraudulently altered photographs for 11 Lynch Street.

Ex. B at 8-12.

    23.    With respect to 91-99 South Third Street, ALJ Miller set forth the process during which Mr. Fekete submitted photographs of a corner at which a catch basin had to be replaced. Ex. B at 12-13. In response to an objection by Plan Examiner Gallagher to the conditions he observed in the photograph annexed as Exhibit E to the Moed Dec., he submitted Exhibit F, which, but for the complete replacement of the catch basin and repair of the curb, was in every detail identical to Exhibit E. The exact same cars were parked on the street. The exact

Kramer Declaration    - 11 -

same pedestrian was poised on the far sidewalk. The exact same crushed plastic soda bottle was on the roadway near the catch basin. Ex. B at 13. Plan Examiner Gallagher testified that it would be impossible to replace the old catch basin with the new one and repair the curb while the pedestrian was poised mid-step. Ex. B at 14.

24. After setting forth her reasons for finding that DOB had not established Mr. Fekete's culpability, ALJ Miller made the following findings with respect to plaintiff Nation:

> Respondent Nation, however, must be held to a different standard. As previously discussed, he is a licensed engineer, guided by a professional code of conduct and a code of ethics. It is undisputed that other than reviewing and certifying the photograph, respondent Nation had nothing to do with the work performed for the BPP at 91-99 South Third Street. Neither he, nor his agents/employees, performed the work, or were ever at the site. Moreover, respondent Nation was not even aware of who actually took the photograph.
>
> Reviewing the February 15, 2005 photograph for only a few minutes and approving it at face value was negligent, particularly given the advent of easily manipulated digital photography. Since the photograph was not taken by respondent Nation nor anyone under his direction and control, he had a professional and ethical obligation to go to the site to inspect the work and ensure that the photograph accurately reflected the condition of the pavement and the catch basin prior to certifying the photograph. It is difficult to believe that a licensed professional would be willing to attest to the accuracy of a photograph without visiting the photographed location. In sum, respondent Nation failed to exercise a degree of care that a licensed engineer of ordinary prudence would have exercised under the same circumstance. While petitioner did not establish that he knew the photograph was altered, clearly he was negligent in submitting it without a more complete review.
>
> Accordingly, I find that the Department failed to establish that respondent Nation knowingly made a fraudulent submission, but that it met its burden with respect to proving that respondent Nation negligently made a false statement and submission by

> certifying the fraudulent altered photograph for 91-99 South Third Street.

Ex. B at 16.

25. With respect to 150 29th Street, ALJ Miller set forth the process by which DOB received a complaint and photographs from a neighbor of that premises about the construction of a second story on the top of the existing one-story cinderblock shack. Ex. B at 16-17. The neighbor's photographs (one of which is annexed to the Moed Dec. as Exhibit G) made clear that the second story was new construction. The application seeking a building permit to renovate an existing two-story building had been submitted by plaintiff under Directive 14, a Departmental directive that enables a professional applicant not only to professionally certify the accuracy of the plans but also to certify the conformity of the work performed pursuant to those plans and thus obviate the need for a Departmental inspection. As a result, these plans had been subject to only limited, cursory review.

26. There also were significant discrepancies and errors in the plans that signaled their falsity. Passing off this new construction as merely a minor alteration of an existing two-story structure provided financial advantages to the builder as well as avoiding the additional inspections that DOB would have performed if the new construction had been declared. Ex. B at 18-19.

> Respondent Nation testified that he never went to the site, asserting that he was under no professional or legal obligation to do so. …
>
> Respondent Nation contended that he did a sufficient review of the alteration application before certifying it. He testified that he reviewed the plans, an asbestos report and the I-Card for the premises [transcript citations omitted]. I found respondent Nation's testimony incredible. He was evasive and vague. For the most part, he was non-responsive and appeared disdainful of the entire proceeding.…

Kramer Declaration                                  - 13 -

...It is undisputed that respondent Nation never went to the site. His review was limited primarily to the plans drafted by someone else. It would not have been readily apparent from looking at the plans alone that the existing structure was actually a one-story building.

The Department did, however, amply prove that respondent Nation was negligent in submitting these documents. As discussed previously, respondent, as a licensed engineer, is required to abide by a professional code set forth by the New York State Board of Regents.

The only name on the blue prints, is respondent Nation's, giving the distinct impression that it had been drafted by him or at least someone in his employ [citation to exhibit omitted]. Yet, respondent Nation acknowledged that he did not draft the plans and that the draftsman did not work for him or his engineering firm. He had trouble recalling the draftsman's name and was uncertain of his training or educational background. Respondent Nation further testified that he never bothered to ask the draftsman if he ever went to the site [transcript citations omitted]. Thus, respondent Nation's certification that as the applicant, he "prepared or supervised the preparation of the plans and specifications" is far from accurate.

Respondent Nation is professionally required by the Rules of the Board of Regents to conduct a thorough review prior to certifying any documents for a project in which he did not provide services. There are inherent contradictions in the plans and dimensional discrepancies that should have alerted respondent Nation that there was a problem. Yet, he either did not notice them or ignored them. His lackadaisical attitude with respect to this project is alarming. This alteration work involved more than properly laying a sidewalk. It entailed constructing structural elements in a person's home, which if not done properly could have catastrophic consequences.

Respondent Nation should not have certified plans which had obvious discrepancies and errors and were internally inconsistent. This is particularly the case because the draftsman was not his employee and he did not know the draftsman's professional qualifications or training. This is in direct violation of the Code of Ethics for Engineers, which requires engineers not to affix their signature to any plan not prepared under their direction and control [citation to exhibit omitted]. Upon reviewing these plans, respondent Nation had a professional and ethical obligation

>     to determine their accuracy by visiting the site himself or dispatching an employee under his supervision to the premises, prior to self-certifying the plans as being in compliance with the Building Code and other applicable laws and regulations. Had he gone to the site, it would have become obvious that the existing structure had only one story.

Ex. B at 19-21.

>     27.    At the conclusion of her Report, ALJ Miller made the following Recommendation:

>     The Department and the public have a recognized safety interest in ensuring that builder's pavement plans and alteration applications are accurate. Directive 14-75 was designed to facilitate the construction process, not provide a safety shortcut. Since the Department is not inspecting the building site and conducting an in-depth review of the submission, the accuracy and good character of the certifying licensed professional is essential to the process. It is an abuse of the public's trust to certify such documents without ascertaining whether they are accurate.

>     The only common link with respect to each of these properties and false submissions to the Department is respondent Nation. Respondent Nation has demonstrated that he has no sense of professional responsibility or propriety and that he cannot be relied upon to properly exercise his professional judgment within the self-certification process. [citation to prior OATH Report and Recommendation]

>     Respondent Nation's disregard for public safety and lack of integrity brings into question whether he is actually fit to be licensed by the Board of Regents as an engineer. At the very minimum, he should not be permitted to continue participating in the Department's self-certification program. It is a privilege that should be reserved for ethical, honest, trustworthy, and diligent professionals, which respondent has proven himself not to be. Accordingly, I recommend that respondent Nation be excluded from participation in the Department's limited supervisory review procedures.

Ex. B at 22-23.

28. By letter dated December 4, 2007 (a copy of which is annexed to the Moed Dec. as Exhibit H), DOB Commissioner Patricia Lancaster adopted ALJ Miller's Report and Recommendation, as follows:

> I hereby adopt Judge Miller's Report and Recommendation and findings of fact and find you guilty in accordance with her recommendation. Accordingly, I hereby revoke your professional certification privileges, including those under Directive 14 of 1975, effective immediately.
>
> Administrative Code §26-124 (c), as amended, authorizes the Commissioner of the Department of Buildings to refuse to accept any application or other document bearing the signature of someone who has been found to have intentionally or negligently submitted false documents to the Department. You are hereby directed to submit in writing within ten business days of the date of this letter any reasons why I should not impose this further sanction.

29. Plaintiff responded by letter dated January 2, 2008 (a copy of which is annexed hereto as Exhibit I). He contended that the imposition of the terms of Admin. Code § 26-124(c), which had become law on August 15, 2007, constituted an impermissible ex post facto penalty that was tantamount to taking away his license to practice engineering. He contested the ALJ's findings, asserting that he did not have the responsibility to examine the photographs that accompanied the builder's pavement plans for anything other than the quality of the curbs. He asserted that he had a valid basis for believing that the building at 150 29th Street had two stories. He challenged the penalty of exclusion from filing to be draconian and pointed to the fact that it had never before been imposed against other building professionals.

30. By letter dated January 15, 2008 (a copy of which is annexed to the Moed Dec. as Exhibit J), DOB Commissioner Lancaster wrote to plaintiff's attorney and responded to plaintiff's arguments as follows:

As Judge Miller found, Mr. Nation was aware or should have been aware that attesting to the accuracy of plans and photographs that he did not prepare, without either visiting the sites involved or taking any other steps to determine the documents' accuracy, was negligent and violated professional standards of conduct. Your argument that the "borough pavement plan" involved in two of the applications is a "relatively minor application" ignores Mr. Nation's repeated indifference to professional standards of care. This argument also ignores Judge Miller's finding that Mr. Nation negligently submitted false documents in connection with an Alteration Type 2 application concerning an enlargement of a house.

In these circumstances, refusing to accept any application or other document bearing the signature of Mr. Nation, pursuant to Administrative Code § 26-124(c) is an appropriate remedial measure to protect the public from the harm associated with his pattern of negligent conduct with respect to submissions to the Department of Buildings. While I have the authority under § 26-124(c) to refuse permanently to accept documents from Mr. Nation, because this remedy was not in place when Mr. Nation committed these acts, I will exercise my discretion to refuse to accept documents bearing Mr. Nation's signature for two years, effective immediately. At the conclusion of this two year period, Mr. Nation will be allowed to submit applications and other documents bearing his signature. However, his ability to file applications and other documents will then be subject to a three year probationary period. If during that probationary period Mr. Nation intentionally or negligently files any other false applications or documents with the Department, I reserve the right to further suspend or revoke his ability to file documents with the Department.

It should be noted, in addition, that when the above-mentioned suspension ends, the revocation of Mr. Nation's professional certification privileges as referenced in the December 4, 2007 letter, will still remain in full force and effect.

### THE EXCLUSION OF PLAINTIFF FROM FILING IS APPROPRIATE

31. Plaintiff is the first building professional that the Department seeks to exclude from submitting applications. The provision authorizing exclusion took effect less than four months prior to the consideration by DOB's Commissioner of his case. His argument that

Kramer Declaration                                - 17 -

no one else has been subject to such a serious consequence is correct but is merely a function of the short time that has passed since the enactment of the provision. The fact that he is the first building professional being subject to its reach does not make the consequence unfair.

32. Plaintiff displayed disregard of his professional obligations pursuant to several sources: the rules of the New York State Board of Regents governing Professional Engineers, the Code of Ethics for Engineers published by the National Society of Professional Engineers, and 1 RCNY § 21-02(b)(4) when he placed his seal on documents without adding any skill, expertise, or oversight to them. He placed his professional seal on documents that were not prepared by him or anyone in his employ or under his control, upon whom it might be reasonable to rely. He was, in effect, blindly placing his professional imprimatur on documents whose provenances were unknown to him. In disregarding his obligation to use his seal only to certify that the documents complied with all applicable laws, he threatened public safety and the integrity of the application approval process.

33. The Department cannot be put in the position of having to closely supervise plaintiff in order to ensure that every document he submits accurately reflects the actual conditions of the construction at issue.

34. There is no doubt that the consequence to plaintiff of the Commissioner's determination is harsh. But the Commissioner's determination that plaintiff is not to be trusted with submitting accurate plans to the Department was based on a extensive record of his disregard of the importance of diligence in affixing his seal to documents and submitting them to the Department.

35. Plaintiff' characterization of the consequence of the Commissioner's determination – that he is precluded from practicing his profession – is an overstatement. While

plaintiff is precluded from submitting applications and documents whose accuracy and validity are attested to by his signature, he is at liberty to work under the supervision of another building professional. This is not an unreasonable consequence for someone who has been so cavalier about the responsibilities incumbent on one who places his or her seal on documents submitted to a governmental agency. A period of close supervision could be remedial for plaintiff.

36. The Department urges this Court to reject plaintiff's application for a stay of exclusion from filing and to uphold the Department's determination.

Dated:   New York, New York
         February 1, 2008

                                          _____
                                          STEPHEN P. KRAMER